# EXHIBIT D



## UW Health

### University of Wisconsin
### Hospital and Clinics

600 N. Highland Ave.
Madison, WI 53792

RE: William Boykin
DOB 12/25/1956
MR #1870704

November 30, 2005

Judith K Jobe
Sr. Vice President of Human Resources
Rosecrance Inc.
3815 Harrison Ave
Rockford, IL 61108

Dear Ms. Jobe:

I wanted to give you a brief update on William Boykin, whom I know you are very familiar with. As you know, Mr. Boykin underwent orthotopic liver transplant and splenectomy at our facility on September 17, 2005 for end-stage liver disease due to hepatitis C and alcoholic cirrhosis.

Mr. Boykin initially had complications of thrombosis of his portal vein, which required thrombectomy and primary poor function of his liver allograft, however, this recovered quite nicely and he now has excellent liver function. He has had however, several other complications peri-operatively. We emergently took Mr. Boykin back to the operating room on post-op day three for intra-abdominal bleeding and found a large hematoma in the splenic bed, and also repaired a biliary leak at the anastomosis. He then had complications of pancreatitis and pancreatic leak which then caused large abdominal fluid collections that became infected. He was re-admitted for radiological placement of two abdominal drains to drain these abscesses and placed on intravenous antibiotics. He was placed in a short term rehabilitation facility close to home and he successfully completed occupational and physical therapy rehab goals. However, his infections continued to be problematic and he is currently re-hospitalized with us. Yesterday we were able to place a stent in his pancreatic duct in the hopes that the pancreatic tail leak will cease and that his infections will clear. Throughout his complications, Mr. Boykin has been very willing and able to comply with his very rigorous regimen, and he has excellent support through his family and friends. I feel in spite of his many complications, he has an excellent prognosis for full recovery and he will be able to return to work to his full capacity.

I am requesting that as a reasonable accommodation under the Americans with Disabilities Act that you extend Mr. Boykin's unpaid time off. I estimate at this point Mr. Boykin will need four to six more weeks off before he would be able to return to work. Certainly, I am very willing to provide additional information if you should require. Thank you for your consideration. It is a pleasure for us to continue to provide care for Mr. Boykin.

Sincerely,

Stuart J Knechtle MD
Surgical Director of Liver Transplant Program
Professor of Surgery
Department of Transplant Surgery

# EXHIBIT E

**EXHIBIT**

E



May 4, 2006

Marcia Horton
HCH Administration

Group: Rosecrance Health Network
Contract Year: 7/1/2005 to 8/31/2006
Employee: William Boykin
S.S. #: 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
Claimant: William Boykin
Submissions: 1-5

Dear Marcia,

We have reviewed the response to our request for additional information regarding the above-referenced stop loss claim. Enclosed please find a reimbursement check in the amount of $237,200.28. Please see below for an explanation of our determination and the ineligible $382,577.20.

| Submission | Requested | Lasered Deductible | Total Requested | Ineligible | Eligible |
|---|---|---|---|---|---|
| 1 | $ 321,788.28* | $ 135,000.00 | $ 186,788.28* | $24,898.68 | $161,889.55 |
| 2 | $ 16,714.78 | | $ 208,502.96 | | $16,714.78 |
| 3 | $ 290,194.98 | | $ 498,697.94 | $231,599.08 | $ 58,595.95 |
| 4 | $ 79,828.81 | | $ 578,526.75 | $79,828.81 | $ 0.00 |
| 5 | $46,250.68 | | $619,777.43 | $46,250.68 | $0.00 |
| Subtotal: | $754,777.48 | $ 135,000.00 | $619,777.43 | $382,577.20 | $ 237,200.28 |

The reimbursement request submitted was calculated for a $115,000.00 specific stop loss deductible on top of the $50,000.00 group deductible. However, per the contract, the claimant was lasered at $135,000.00.

> With respect to the Covered Person whose Name is <u>William Boykin</u>, the following alterations to the Schedule of Stop Loss apply only if such Covered Person receives a liver transplant:
>
> Specific Deductible (per covered person) <u>$185,000</u>
> Lifetime Maximum Specific Benefit <u>$1,865,000</u>

This separate retention level is applied in place of the group deductible. Please be advised that the reimbursement has been calculated according to the $135,000.00 specific stop loss deductible level.

According to the Memorandum of Understanding, signed 3/14/2005, a formal agreement was reached regarding the patient's potential liver transplant charges at University of Wisconsin Hospital & Clinics and University of Wisconsin Medical Foundation. The memorandum states in pertinent part under the heading Case Rate Inclusions & Outlier Provisions:

> <u>Professional – UWMF</u>
> The health benefit plan of Rosecrance Health Network agrees to reimburse
> the University of Wisconsin Medical Foundation the lesser of 90% of billed

---

* This figure represents the adjusted amount requested as calculated using the $135k lasered deductible applied to the claimant.

708 479 3236    P.05

charges or a case rate of $68,577 (living donor) or $48,625 (cadaveric donor) for the first 27 days of care beginning on the date of admission for the transplant stay... In no event will UWMF receive less than fifty percent (50%) of billed charges.

The following claims are UWMF charges incurred during the claimant's transplant stay of 9/16/05 – 10/5/05:

| Claim | Provider | | | Billed | Paid | Date |
|---|---|---|---|---|---|---|
| 05894377-01 | Univ of WI Medical Foundation | | | | | |
| 05895122-01 | Univ of WI Medical Foundation | 9/16/2005 | 9/16/2005 | $60.00 | $48.60 | 11/7/2005 |
| 05895123-01 | Univ of WI Medical Foundation | 9/16/2005 | 9/16/2005 | $218.00 | $197.10 | 11/7/2005 |
| 05895181-01 | Univ of WI Medical Foundation | 9/16/2005 | 9/16/2005 | $81.50 | $73.55 | 11/7/2005 |
| 05895068-01 | Univ of WI Medical Foundation | 9/17/2005 | 9/17/2005 | $2,058.50 | $1,848.15 | 11/14/2005 |
| 05895096-01 | Univ of WI Medical Foundation | 9/17/2005 | 9/17/2005 | $41,989.00 | $37,708.25 | 11/7/2005 |
| 05894387-01 | Univ of WI Medical Foundation | 9/17/2005 | 9/17/2005 | $7,520.00 | $6,768.00 | 11/7/2005 |
| 05895188-01 | Univ of WI Medical Foundation | 9/17/2005 | 9/17/2005 | $5,200.00 | $4,212.00 | 11/14/2005 |
| 05896484-01 | Univ of WI Medical Foundation | 9/17/2005 | 9/20/2005 | $2,844.00 | $2,109.60 | 11/14/2005 |
| 05896441-01 | Univ of WI Medical Foundation | 9/17/2005 | 9/20/2005 | $13,255.75 | $11,930.18 | 11/14/2005 |
| 05895120-01 | Univ of WI Medical Foundation | 9/18/2005 | 9/18/2005 | $98.00 | $88.70 | 11/14/2005 |
| 05896416-01 | Univ of WI Medical Foundation | 9/19/2005 | 9/26/2005 | $1,805.00 | $1,624.50 | 11/14/2005 |
| 05896427-01 | Univ of WI Medical Foundation | 9/19/2005 | 9/26/2005 | $139.50 | $125.55 | 11/14/2005 |
| 05894373-01 | Univ of WI Medical Foundation | 9/19/2005 | 10/4/2005 | $1,383.00 | $1,244.70 | 11/14/2005 |
| 05895074-01 | Univ of WI Medical Foundation | 9/20/2005 | 9/20/2005 | $1,356.00 | $1,098.86 | 11/14/2005 |
| 05895098-01 | Univ of WI Medical Foundation | 9/20/2005 | 9/20/2005 | $1,804.00 | $1,623.60 | 11/14/2005 |
| 05896422-01 | Univ of WI Medical Foundation | 9/20/2005 | 9/20/2005 | $51.00 | $45.90 | 11/14/2005 |
| 05895065-01 | Univ of WI Medical Foundation | 9/21/2005 | 9/26/2005 | $132.50 | $119.25 | 11/14/2005 |
| 05895090-01 | Univ of WI Medical Foundation | 9/23/2005 | 9/23/2005 | $159.00 | $128.79 | 11/7/2005 |
| 05895185-01 | Univ of WI Medical Foundation | 9/23/2005 | 9/23/2005 | $46.50 | $37.20 | 11/14/2005 |
| 05895072-01 | Univ of WI Medical Foundation | 9/25/2005 | 9/25/2005 | $132.50 | $119.25 | 11/14/2005 |
| 05895092-01 | Univ of WI Medical Foundation | 9/25/2005 | 9/25/2005 | $81.50 | $73.85 | 11/7/2005 |
| 05895119-01 | Univ of WI Medical Foundation | 9/26/2005 | 9/26/2005 | $46.50 | $37.20 | 11/14/2005 |
| 05895100-01 | Univ of WI Medical Foundation | 9/27/2005 | 9/27/2005 | $320.00 | $288.00 | 11/14/2005 |
| 05895087-01 | Univ of WI Medical Foundation | 9/27/2005 | 9/27/2005 | $46.50 | $41.85 | 11/7/2005 |
| 05895128-01 | Univ of WI Medical Foundation | 9/27/2005 | 9/27/2005 | $646.00 | $581.40 | 11/14/2005 |
| 05895118-01 | Univ of WI Medical Foundation | 9/28/2005 | 9/30/2005 | $345.00 | $310.50 | 11/14/2005 |
| 05894380-01 | Univ of WI Medical Foundation | 9/28/2005 | 9/28/2005 | $115.00 | $103.50 | 11/14/2005 |
| 05895077-01 | Univ of WI Medical Foundation | 9/29/2005 | 9/30/2005 | $423.00 | $346.68 | 11/7/2005 |
| 05895078-01 | Univ of WI Medical Foundation | 9/30/2005 | 9/30/2005 | $46.50 | $41.85 | 11/7/2005 |
| 05894378-01 | Univ of WI Medical Foundation | 10/1/2005 | 10/2/2005 | $230.00 | $207.00 | 11/14/2005 |
| 05895083-01 | Univ of WI Medical Foundation | 10/3/2005 | 10/3/2005 | $172.00 | $189.82 | 11/14/2005 |
| | Univ of WI Medical Foundation | 10/3/2005 | 10/5/2005 | $230.00 | $207.00 | 11/14/2005 |
| | | | | Total Billed: | $82,530.75 | |
| | | | | Total Paid: | $73,523.68 | |

Per the payment agreement cited above, the charges should have been paid at 90% of billed charges ($74,277.68) or the case rate of $48,625.00, whichever was less. Therefore, payments should not have exceeded $48,625.00. However, as payments were made in excess of the agreed upon case rate, a total of $24,898.68 has been deducted from the reimbursement request.

The Stop Loss Contract limits reimbursement to those:

> [E]ligible Losses Paid by the Policyholder over and above the Specific Deductible for a Covered Person while this Contract is in force as set forth in the Schedule of Stop Loss, and subject to the terms, conditions and limitations of this Contract.

PITS & ROBINSON                                708 479 3236        P.06

Covered Person is defined as:

> [A]ny one individual entitled to benefits under the specific terms and provisions of the Employee Benefit Plan. Only eligible classes and individual(s) whose initial and continued eligibility is fully described in the copy of the Plan on file with the Company shall be considered a Covered Person.

Employee Benefit Plan is defined as:

> [T]he self-funded Plan of benefits provided by the Policyholder for Covered Persons. A copy of the Plan or plans in effect on the Contract Effective Date is on file with the Company and made a part of this Contract.

The Eligibility Verification form indicates the following leave dates:

> FMLA:        9/16/2005 – current

Based upon the eligibility information submitted and in order to process the submitted claim, RMTS has assumed that 12 weeks of FMLA was used to establish continued eligibility through the date of its exhaustion on 12/8/2005.

According to the additional information provided, following the exhaustion of FMLA the claimant was granted an extension of his medical leave up to January 19, 2006. However, the Plan does not support continuation of coverage beyond the 12 weeks of leave provided by FMLA.

Therefore, the claimant's eligibility does not extend beyond the 12 weeks of FMLA that was applied from 9/16/2005 through 12/8/2005. Mr. Boykin was no longer a Covered Person under the Plan after 12/8/2005 and any claims incurred after that date are not eligible for reimbursement under the Plan. Moreover, the Stop Loss Contract specifically excludes "[a]mounts Paid for any individual who is not ligible for benefits under the Plan".

Additionally, Mr. Boykin was admitted to the University of Wisconsin Hospital on 11/23/2005 and was discharged on 1/26/2006, well after his coverage under the Plan had ended. Under the terms of the Stop Loss Contract, the entire hospital stay is considered Incurred on the date of discharge. Per the Stop Loss Contract:

> INCURRED means the date on which the Services Are Rendered or supplies are received by the Covered Person. For inpatient hospital/facility charges and professional fees provided during an inpatient stay a claim is considered incurred on the date the Covered Person is discharged from the hospital/facility.

As these charges are considered "Incurred" at a time when Mr. Boykin was not covered under the Plan, these charges are not eligible under the Stop Loss Contract.

Accordingly, the following charges incurred on or after 11/23/2005 are ineligible. A total of $382,577.20 has been deducted from the reimbursement. The following is a breakdown of the excluded charges.

| | | | | | |
|---|---|---|---|---|---|
| 05434150-01 | University of Wisconsin Hospital | 11/23/2005 | 1/5/2006 | $272,469.45 | $231,599.03 |
| 05434150-02 | University of Wisconsin Hospital | 1/6/2006 | 1/26/2006 | $95,975.07 | $79,828.81 |

| | | | | | |
|---|---|---|---|---|---|
| 05580769-01 | University of Wisconsin Hospital | 12/19/2005 | 12/19/2005 | $115.00 | $97.75 |
| 05580857-01 | University of Wisconsin Hospital | 12/19/2005 | 12/19/2005 | $46.50 | $39.58 |
| 05580649-01 | University of Wisconsin Hospital | 12/20/2005 | 12/20/2005 | $172.00 | $146.20 |
| 05580667-01 | University of Wisconsin Hospital | 12/20/2005 | 12/20/2005 | $646.00 | $519.10 |
| 05580820-01 | University of Wisconsin Hospital | 12/20/2005 | 12/22/2005 | $345.00 | $293.25 |
| 05580880-01 | University of Wisconsin Hospital | 12/20/2005 | 12/20/2005 | $51.00 | $43.35 |
| 05580844-01 | University of Wisconsin Hospital | 12/20/2005 | 12/20/2005 | $858.00 | $804.30 |
| 05580845-01 | University of Wisconsin Hospital | 12/20/2005 | 12/20/2005 | $46.50 | $39.58 |
| 05580658-01 | University of Wisconsin Hospital | 12/21/2005 | 12/21/2005 | $172.00 | $146.20 |
| 05580808-01 | University of Wisconsin Hospital | 12/21/2005 | 12/21/2005 | $629.00 | $534.65 |
| 05580804-01 | University of Wisconsin Hospital | 12/21/2005 | 12/21/2005 | $39.58 | $39.58 |
| 05580655-01 | University of Wisconsin Hospital | 12/22/2005 | 12/22/2005 | $172.00 | $146.20 |
| 05580754-01 | University of Wisconsin Hospital | 12/23/2005 | 12/23/2005 | $172.00 | $146.20 |
| 05580827-01 | University of Wisconsin Hospital | 12/23/2005 | 12/23/2005 | $115.00 | $97.75 |
| 05580658-01 | University of Wisconsin Hospital | 12/24/2005 | 12/24/2005 | $172.00 | $146.20 |
| 05580795-01 | University of Wisconsin Hospital | 12/24/2005 | 12/25/2005 | $280.00 | $195.50 |
| 05580712-01 | University of Wisconsin Hospital | 12/25/2005 | 12/25/2005 | $172.00 | $146.20 |
| 05580908-01 | University of Wisconsin Hospital | 12/26/2005 | 12/26/2005 | $115.00 | $97.75 |
| 05580811-01 | University of Wisconsin Hospital | 12/27/2005 | 12/27/2005 | $646.00 | $549.10 |
| 05580904-01 | University of Wisconsin Hospital | 12/27/2005 | 12/30/2005 | $460.00 | $391.00 |
| 05580807-01 | University of Wisconsin Hospital | 12/28/2005 | 12/28/2005 | $46.50 | $39.58 |
| 05580708-01 | University of Wisconsin Hospital | 12/30/2005 | 12/30/2005 | $60.00 | $51.00 |
| 05580710-01 | University of Wisconsin Hospital | 12/30/2005 | 12/30/2005 | $60.00 | $51.00 |
| 05580860-01 | University of Wisconsin Hospital | 12/30/2005 | 12/30/2005 | $60.00 | $51.00 |
| 05580912-01 | University of Wisconsin Hospital | 12/31/2005 | 12/31/2005 | $115.00 | $97.75 |
| 55580916-01 | University of Wisconsin Hospital | 1/1/2006 | 1/1/2006 | $119.00 | $101.15 |
| 05580981-01 | University of Wisconsin Hospital | 1/2/2006 | 1/2/2006 | $48.00 | $40.80 |
| 05580946-01 | University of Wisconsin Hospital | 1/6/2006 | 1/6/2006 | $178.00 | $151.30 |
| 05580959-01 | University of Wisconsin Hospital | 1/7/2006 | 1/7/2006 | $712.00 | $605.20 |
| 05580950-01 | University of Wisconsin Hospital | 1/9/2006 | 1/15/2006 | $856.00 | $802.60 |
| 05580927-01 | University of Wisconsin | 1/9/2006 | 1/9/2006 | $569.00 | $568.65 |
| 05580919-01 | University of Wisconsin Hospital | 1/10/2006 | 1/10/2006 | $651.00 | $553.35 |
| 05580955-01 | University of Wisconsin Hospital | 1/10/2006 | 1/10/2006 | $178.00 | $151.30 |
| 05580969-01 | University of Wisconsin Hospital | 1/11/2006 | 1/20/2006 | $712.00 | $605.20 |
| 05580940-01 | University of Wisconsin Hospital | 1/16/2006 | 1/16/2006 | $669.00 | $568.65 |
| 05580606-01 | University of Wisconsin Hospital | 1/17/2006 | 1/17/2006 | $5,120.00 | $4,352.00 |
| 05580611-01 | University of Wisconsin Hospital | 1/17/2006 | 1/17/2006 | $1,445.00 | $1,228.25 |
| 05580978-01 | University of Wisconsin Hospital | 1/17/2006 | 1/17/2006 | $178.00 | $151.30 |
| 05580786-01 | University of Wisconsin Hospital | 1/20/2006 | 1/20/2006 | $84.50 | $71.83 |
| 05580748-01 | University of Wisconsin Hospital | 1/20/2006 | 1/20/2006 | $651.00 | $553.35 |
| 05580935-01 | University of Wisconsin Hospital | 1/20/2006 | 1/20/2006 | $48.00 | $40.80 |
| 05580740-01 | University of Wisconsin Hospital | 1/22/2006 | 1/22/2006 | $178.00 | $151.30 |
| 05580744-01 | University of Wisconsin Hospital | 1/23/2006 | 1/23/2006 | $178.00 | $151.30 |
| 05580923-01 | University of Wisconsin Hospital | 1/25/2006 | 1/25/2006 | $346.00 | $294.10 |
| 05611704-01 | Swedish American Hospital | 1/26/2006 | 1/26/2006 | $497.70 | $351.89 |
| 05580991-01 | University of Wisconsin Hospital | 1/30/2006 | 1/30/2006 | $94.00 | $79.90 |
| 05591784-01 | University of Wisconsin Hospital | 2/6/2006 | 2/6/2006 | $1,155.61 | $982.27 |
| 05588993-01 | University of Wisconsin Hospital | 2/18/2006 | 2/18/2006 | $94.00 | $79.90 |
| 436882-03 | HCH Administration | 2/21/2006 | 2/21/2006 | $440.00 | $440.00 |
| | | | | Total: | $46,250.68 |

Please contact me should you have any questions regarding this determination or if you have any additional information you would like us to consider.

Sincerely,

Ronald J. Geck
V.P. Claims – Claims Examining

---

*The Old Mercantile Exchange Building Six Harrison Street, New York, NY 10013*
*Tel. 212-925-0017 Fax 212-431-1420*

# EXHIBIT F

EXHIBIT

# BELL, BOYD & LLOYD LLC

70 West Madison Street, Suite 3100 • Chicago, Illinois 60602-4207
312.372.1121 • Fax 312.827.8000

MICHAEL J. HAYES, SR.
312.807.4201
mhayes@bellboyd.com
Direct Fax: 312.827.8176

July 12, 2006

## VIA U.S. MAIL, ELECTRONIC MAIL AND FACSIMILE (614) 854-3489

Christopher E. Wasson, Esq.
Senior Counsel
Office of General Counsel
Nationwide Health Plans
5525 Parkcenter Circle Co-03-30
Dublin, Ohio 43017

      Re:    Group: Rosecrance Health Network
              Employee/Claimant: William Boykin

Dear Mr. Wasson:

      This letter is a follow-up to my letter dated June 28, 2006, regarding the claim of Rosecrance Health Network ("Rosecrance") for the treatment of Mr. Boykin (S.S. #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). As you know, we have reviewed the letter of May 4, 2006 from Mr. Ronald Geck of RMTS to Ms. Marcia Horton of HCH Administration. In his letter, on behalf of Nationwide, Mr. Geck stated that RMTS has denied coverage of $382,577.20 of the above referenced claim as "ineligible." He has approved payment of $237,200.23 as eligible for coverage after the application of the $135,000.00 "stop loss deductible." (For your convenience, we have attached this letter as Exhibit A.) Below is a more detailed explanation as to why Rosecrance believes that Nationwide's partial denial of this claim was erroneous, arbitrary and capricious, and in violation of the terms of its policy as well as federal and state law.

      The stop loss contract between Nationwide and Rosecrance provides for reimbursement where "the Policyholder's Losses for the Benefit Period, as shown in the Schedule of Stop Loss, exceeds the Specific Deductible . . ." Here, after the deductible was applied, Rosecrance incurred costs in the amount of $619,777.43 for the benefit period. Accordingly, under the contract, Nationwide must reimburse Rosecrance in this amount.

      First, Nationwide is bound by the terms of this contract, including the terms of the specific deductible. As set forth in Mr. Geck's letter, "per the contract," Mr. Boykin is a Covered Person, subject to certain alterations from the group deductible. Nationwide

421312/E/1

Christopher E. Wasson, Esq.
July 12, 2006
Page 2

specifically negotiated and contracted for a deductible of $135,000.00 for Mr. Boykin, as opposed to the $60,000 group deductible, due to Mr. Boykin's known and disclosed liver condition. In fact, the contract expressly stated that the $135,000.00 "alteration[] to the Schedule of Stop Loss [is applicable] only if such Covered Person receives a liver transplant." As an experienced insurance company, Nationwide should have known that recovery from a liver transplant would be lengthy and would likely cost more than $135,000.00. While in hindsight Nationwide may be dissatisfied with the terms of the policy, Illinois courts are clear that they "will not remake a contract in order to give a litigant a better bargain than he himself was satisfied to make." *Jackim v. CC-Lake, Inc.,* 363 Ill. App. 3d 759, 767 (1st. Dist. 2005). Therefore, Nationwide is bound by the contract as negotiated and must pay Rosecrance for costs incurred above the $135,000.00 deductible.

Throughout March and April of 2006, in an effort to delay coverage payment, RMTS required HCH to provide multiple pieces of detailed information regarding when Mr. Boykin's name was placed on the liver transplant list. RMTS attempted to use this information to argue that Rosecrance should have known that a liver transplant was likely. Indeed, Rosecrance did know that a liver transplant was likely, and disclosed this to Nationwide. As set forth above, Nationwide specifically contemplated the possibility of a liver transplant when arranging an alternate deductible for Mr. Boykin. Nevertheless, RMTS pursued this frivolous argument, and failed to provide any coverage whatsoever until May 3, 2006, nearly six months after the first claim for reimbursement was submitted. This was clearly a delay tactic by RMTS on Nationwide's behalf, which is improper under the terms of the policy as well as Illinois law. *See* 215 ILCS 5/155; *Hall v. Svea Mutual Ins. Co.,* 143 Ill. App. 3d 809, 810 (3d. Dist. 1986).

Furthermore, pursuant to the Americans with Disabilities Act ("ADA"), Nationwide is required to extend Mr. Boykin's coverage beyond the purported date of exhaustion on December 8, 2005 to January 26, 2006. While Nationwide recognized Mr. Boykin's twelve week continued eligibility under the Family Medical Leave Act ("FMLA"), it has failed to acknowledge the additional six week extension Mr. Boykin is entitled to, and Rosecrance is required to provide, under the ADA. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). An employer discriminates under the ADA when it fails to make reasonable accommodations for an employee with a disability. 42 U.S.C. § 12112(b)(5)(A).

Pursuant to his physician's written orders, Mr. Boykin requested that Rosecrance accommodate him by extending his medical leave beyond the initial 12 week period of extension granted by the FMLA. The legislative history of the ADA and the cases that interpret it advise that employers pay careful attention to employees' requests for accommodations. *Feliberty v. Kemper Corp.,* 98 F.3d 274, 280 (7th. Cir. 1996). Thus, Rosecrance determined that it was required under both the ADA and Illinois case law to accommodate Mr. Boykin's and his physician's request, and granted him a six week extension. *See Kinlaw v. Alpha Baking Co., Inc.,* No. 02 C 1014, 2003 U.S. Dist. Lexis 8319, at *13 (N.D. Ill. May 15, 2003).

421312/E/1

Christopher E. Wasson, Esq.
July 12, 2006
Page 3

While the plan provides that "the maximum amount of FMLA leave that may be taken is 12 weeks," there is nothing in the policy or plan that prevents Rosecrance from granting an additional extension as a reasonable accommodation, as is required under the ADA. In fact, the plan expressly states that "coverage under this plan be continued during a period of approved FMLA leave." Again, although the plan sets forth that the maximum amount of leave is typically 12 weeks under the FMLA, the plan also states that "if any part of this plan conflicts with *any law* that applies to the plan, it is hereby amended to comply with that law." (emphasis added). The ADA clearly required Rosecrance to extend Mr. Boykin's leave.

There is likewise no case law to suggest that once an extension has been granted pursuant to the FMLA, an employer is precluded from granting additional time under the ADA. Indeed, under the FMLA, "[i]f an employee is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, the employer must make reasonable accommodations, etc. [while] [a]t the same time . . . afford[ing] an employee his or her FMLA rights." 29 CFR 825.702(b) (further recognizing that "the ADA allows an indeterminate amount of leave" as a reasonable accommodation, irrespective of the FMLA 12 week leave limitation). In the past, pursuant to this statute, Rosecrance has continued insurance coverage for an employee, where that employee's FMLA leave was extended. To treat Mr. Boykin any differently would have been in direct violation of the ADA and 29 CFR 825.702.

Because Rosecrance was required under the ADA and the FMLA to retain Mr. Boykin as an employee and extend his medical leave, Nationwide is likewise required to provide coverage for Mr. Boykin throughout the extended period, as though Mr. Boykin was a typical Rosecrance employee. Nationwide's failure to do so is in contravention of this Federal statute and Illinois law. *Parker v. Amer. Family Ins. Co.*, 315 Ill. App. 3d 431, 433 (3d. Dist. 2000) (discussing instances where courts invalidate insurance contracts, namely, where they conflict with state laws).

Additionally, Nationwide's argument that Mr. Boykin is not entitled to coverage because his costs were incurred when he was *discharged* from the hospital, "well after his coverage under the Plan ended," is preposterous. Under the employee benefits plan, "[c]harges made for [certain] services furnished during *your hospital confinement* are payable as shown on the schedule of benefits." (emphasis in original) There is no ambiguity here as to how charges are incurred, namely, throughout a covered person's actual confinement. The entire employee benefit plan is expressly "made a part of [Nationwide's] Contract" under the definition of employee benefit plan. Therefore, Nationwide is on notice of the way hospital benefits costs are incurred under the contract and these terms are controlling. Nevertheless, under the policy

> INCURRED means the date on which the Services Are Rendered or supplies are received by the Covered Person. For inpatient hospital/facility charges and professional fees provided during an inpatient stay a claim is considered incurred on the date the Covered Person is discharged from the hospital/facility.

Christopher E. Wasson, Esq.
July 12, 2006
Page 4

This definition is arbitrary, unfairly favors the insurer and will not be upheld under Illinois law. *Parker*, 315 Ill. App. 3d at 433 (Illinois courts invalidate insurance contract clauses where they . . . unfairly favor the insurer). The provision essentially requires a covered person to terminate his hospital stay prematurely, and in many instances against doctors' orders, solely to ensure that the hospital charges incurred are covered. This is not only against public policy but against human decency. Insureds are justified in relying on the good faith judgment of their treating physicians as to the medical necessity of services prescribed (*i.e.* length of hospital stay) and an insurer cannot interfere with this judgment. *See, e.g., Van Vactor v. Blue Cross Assoc.*, 50 Ill. App. 3d 709, 715 (1st. Dist. 1977). To the extent that this provision unreasonably limits liability, it will be construed against Nationwide. *Id.* ("ambiguous provisions or equivocal expressions whereby an insurer seeks to limit its liability will be construed most strongly against the insurer and liberally in favor of the insured"); *Schoger v. Franklin Life Ins. Co.*, 151 Ill. App. 3d 842, 846 (2d. Dist. 1987) ("Where an ambiguity exists in an insurance contract, that ambiguity will be construed against the insurance company.").

Under COBRA, Mr. Boykin was also entitled to extend his insurance coverage. Mr. Boykin made all of the necessary elections and payments to effectuate that extension, and those payments were accepted. Therefore, Mr. Boykin's coverage was necessarily continued. COBRA requires Rosecrance to continue an employee's coverage, where, as here, the applicable premiums have been paid. 26 USCS § 4980B(a). Thus, Nationwide is required to continue coverage accordingly. *Id.* at (f) ("The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided under the plan to similarly situated beneficiaries under the plan . . .").

Finally, Nationwide should be estopped from raising eligibility issues at this time. Mr. Geck cites the Eligibility Verification form in his May 4, 2006 letter, which lists Mr. Boykin's leave dates under the FMLA as 9/16/2005 - current. Nationwide was in receipt of this information as early as November of 2005. Any potential eligibility issues should have been raised at that time, prior to the expiration of the purported 12 week limitation. This would have enabled the parties to discuss potential issues and decide the appropriate next step. Nationwide failed to do so however, and therefore must be estopped from raising eligibility issues now.

Based on the foregoing, it is clear that Nationwide's sweeping refusal of this claim is unreasonable and made in bad faith. Section 155 of the Illinois Insurance Code permits actions against insurance companies that refuse to settle insurance claims in an unreasonable and vexatious manner. 215 ILCS 5/155; *Hall v. Svea Mutual Ins. Co.*, 143 Ill. App. 3d 809, 810 (3d Dist. 1986) (insured entitled to full amount of attorney fees where basis of insurer's denial of coverage was unreasonable and in bad faith). Section 155 is "ill served if insurers are permitted to persist in bad-faith denials of coverage to the detriment of the insured." *Hall*, 143 Ill. App. 3d at 811 ("The remedy provided [under 155] is designed to secure to the insured the full benefit of the bargain from the insurance contract."). Nationwide's refusal of this claim is precisely what section 155 is intended to prevent through the provision of a sanction.

Christopher E. Wasson, Esq.
July 12, 2006
Page 5


Indeed, it is Rosencrance's belief that Nationwide is required to provide coverage in the amount of $619,777.43, which represents the entire claim amount minus the specific deductible. If you have any questions, please feel free to contact me.

Very truly yours,

Michael J. Hayes, Sr.

DRF:drf

Copies to   Ronald J. Geck, RMTS
Marcia Horton, HCH Administration
Renee Popovits, Esq.

421312/E/1

# EXHIBIT G



AUG 03 2006 14:55 FR NATIONWIDE        6146772285 TO #913128278176



Christopher E. Wasson, Esq.
5525 Parkcenter Circle CO-03-30
Dublin, Ohio 43017
PH: 614-854-8178  FAX: 614-854-3469
wassonc@nationwide.com

*On Your Side*˜

Office of Chief Legal Officer

August 3, 2006

<u>**VIA FACSIMILE (312-827-8176) AND REGULAR U.S. MAIL**</u>

Michael J. Hayes Sr., Esq.
Bell, Boyd & Lloyd, LLC
70 West Madison Street, Suite 3100
Chicago, Illinois 60602-4207

Re:   Rosecrance Health Network; Claimant W. Boykin

Dear Mr. Hayes:

Thank you for your letter dated July 12, 2006, setting forth the basis of Rosecrance Health
Network's disagreement with Nationwide's partial denial of Mr. Boykin's claim. Nationwide, in
conjunction with RMTS, has re-reviewed the claim, taking into consideration the various issues
you raised in the above-referenced letter. Absent the provision of any additional information from
you or your client to Nationwide, Nationwide believes that the initial claim decision rendered in
this case was correct. Each of the arguments set forth in your July 12 letter are individually
addressed below.

1)     Mr. Boykin is a Covered Person under the stop loss contract.

Although Mr. Boykin was clearly a Covered Person under the stop loss policy (indeed
Nationwide has paid over $237,000 in covered charges for this individual), Mr. Boykin ceased
to be a Covered Person when he was no longer eligible for medical benefits under the terms of
the Employee Benefit Plan (the "Plan"). Covered Person is defined in the policy as:

1

[A]ny one individual entitled to benefits under the specific terms and provisions of the Employee Benefit Plan. Only eligible classes and individual(s) whose initial and continued eligibility is fully described in the copy of the Plan on file with the Company shall be considered a Covered Person.

At issue is whether Mr. Boykin remained a Covered Person.

2)      RMTS delayed payment by requiring HCH to provide medical information when RMTS knew it was likely that Mr. Boykin would have a liver transplant.

Actually, it was represented during underwriting that it was *unlikely* that Mr. Boykin would have a liver transplant during the contract year effective July 1, 2005. The case management notes dated December 6, 2004 stated that he was being worked up for a liver and the wait was "2-3 yr +" once approved. A subsequent note dated May 3, 2005 stated that he was approved for a liver transplant and that the wait was up to three years.

Since Mr. Boykin received the liver much faster than represented, RMTS was concerned that he was actually on the transplant list longer than they were told, which, if true, would have impacted RMTS' evaluation of the risk presented by Mr. Boykin. Moreover, records received with the claim indicated that this was a "re-transplant." Accordingly, RMTS requested additional information to confirm that the information they received during underwriting was accurate.

3)      Mr. Boykin maintained his eligibility under the Americans with Disabilities Act ("ADA")

You allege that Mr. Boykin requested and received an extension of his employment and medical insurance under the ADA. As an initial matter, RMTS has received no documentation supporting that he either requested such leave or that it was granted. Your letter dated July 12, 2006 is the first time this issue has been raised in writing, despite the fact that Mr. Boykin's continued eligibility was first questioned by RMTS on February 1, 2006. In fact, the group and its third party administrator initially agreed with RMTS' determination that no leave beyond the leave provided by FMLA was appropriate and indicated that the group would be backdating Mr. Boykin's COBRA election in an attempt to justify his continued eligibility (see attached correspondence dated March 23, 2006). In response to Mr. Geck's reply that such backdating would nevertheless render much of the Boykin claim ineligible under the stop loss policy, the group has apparently formulated this new argument.

In any event, even if Mr. Boykin was entitled under the ADA to a "reasonable accommodation" of "an indeterminate amount of leave" and that such extension was properly requested and approved, the granting of additional leave as a "reasonable accommodation" under the ADA is not the same as the ADA somehow requiring that Rosecrance provide Mr. Boykin with an extension of FLMA leave.

Contrary to your assertion, the very provision you cite in support of your argument [27 CFR 825.702(b)] does not require an employer to extend FLMA leave as a "reasonable accommodation" under the ADA. Instead, it simply states that any ADA "reasonable accommodations" do not compromise an employee's existing FMLA rights:

2

ADA's "disability" and FMLA's "serious health condition" are different concepts, and must be analyzed separately. FMLA entitles eligible employees to 12 weeks of leave in any 12-month period, whereas the ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation.

The regulation goes on to clarify that continued health benefits are not required under the ADA:

FMLA requires employers to maintain employees' group health plan coverage during FMLA leave on the same conditions as coverage would have been provided if the employee had been continuously employed during the leave period, **whereas ADA does not require maintenance of health insurance unless other employees receive health insurance during leave under the same circumstances.** (emphasis added).

Even if the group had extended another employee's FMLA in the past as you seem to allege[1] (again without providing any supporting documentation), the Plan document does not support such continuation of medical coverage. The Plan clearly states the maximum length of time that an employee is entitled to medical coverage during an approved leave:

SPECIAL PROVISIONS FOR NOT BEING ACTIVELY AT WORK

If *you* continue to pay the plan required contributions, *your* coverage will remain in force for no longer than two months during an approved, non-military leave of absence; layoff, or period of total disability. Coverage that is required by the Family and Medical Leave Act will reduce any period shown above. The *plan* must remain in effect for this provision to apply.

At the end of this two-month period, COBRA continuation will be offered.

Therefore, even assuming that Mr. Boykin was entitled to a leave of absence under the ADA, he was not entitled to continued medical coverage after his 12 weeks of FMLA had expired, as the Plan only provides up to two months of coverage during a leave to be run concurrently with FMLA. Such limitation of medical coverage in no way violates the ADA. The ADA does not require an employer to give greater medical benefits to disabled employees than it gives to non-disabled employees on leave. (See Appendix to 29 CFR 1600 (Interpretative Guidance to the ADA): "Leave policies or benefit plans that are uniformly applied do not violate this part simply because they do not address the special needs of every individual with a disability.").

Any decision to provide Mr. Boykin with medical benefits during an ADA mandated leave (again, assuming that such leave was appropriate) is outside the terms of the Plan and not covered by the stop loss contract (see page 8 of the policy excluding claims for "any individual who is not eligible for benefits under the Plan"). In the event Rosecrance amended its Plan to provide such coverage, the amendment has no effect on Nationwide's liability unless it was given appropriate notice and subsequently approved such amendment (see page 9 of the policy - "Amendment to the Plan").

---

[1] Under no circumstances would the ADA require an employer to extend FLMA. They are two different statutes with different purposes and requirements.

4).     The stop loss policy's incurred language impermissibly conflicts with the Plan and is
        against public policy.

It appears that your client has a fundamental misunderstanding of the stop loss contract. Mr.
Boykin is not an insured party of the stop loss contract. The terms of the stop loss policy do not
impact whether his claims are covered under the Plan and therefore would never require him "to
terminate his hospital stay prematurely... to ensure that the hospital charges incurred are covered,"
just like placing a separate individual retention on Mr. Boykin not did affect whether his claims
below the SIR were covered under the Plan. In short, there are many instances when a claim may
be eligible under the Plan and yet ineligible under the stop loss contract. To extent the stop
loss contract conflicts with a Plan provision, the stop loss contract provides:

> **NONCONFLICTING LANGUAGE WITH PLAN AND STOP LOSS CONTRACT:**
> Any provision in the Plan which purports to alter or conflict with the terms, conditions or
> provision of this Contract shall be null and void insofar as it might affect the Company's
> liability under this Contract.

5).     Mr. Boykin was entitled to COBRA.

Mr. Boykin's coverage under the Plan ended at the expiration of his twelve weeks of leave under
the FMLA on December 8, 2005. This was the date of his COBRA qualifying event.
Nevertheless, the group did not provide a COBRA extension offer until January 25, 2006 for
COBRA coverage effective January 20, 2006. The stop loss contract states:

> Notwithstanding the clerical error provision under Miscellaneous Provisions, this Contract
> shall exclude any amounts Paid for Covered Persons, whose coverage under the
> Consolidated Omnibus Budget Reconciliation Act (hereafter referred to as COBRA) is
> continued beyond the timeframes specified by federal law for any reason including clerical
> error of the Policyholder; **who do not receive a valid COBRA extension offer within the
> 30 days immediately following a COBRA qualifying event; who fail to make a valid,
> signed COBRA election within the 60 days immediately following the receipt of
> COBRA election rights from the Policyholder; or who fail to remit COBRA premium
> within the period specified by federal law.** The Company will require written
> documentation that these requirements have been satisfied. (emphasis added).

Since a valid COBRA extension offer was not made timely, the stop loss contract excludes
coverage for Mr. Boykin's claims during the time his eligibility is purportedly maintained by
COBRA.

In addition, it appears that any coverage extended by COBRA would be secondary to Mr. Boykin's
wife's health plan. According to the COBRA election form, Mr. Boykin has had coverage under
his wife's plan since at least January 1, 2006. The Rosecrance Plan states in pertinent part in the
Coordination of Benefits section:

5.    The plan covering an inactive person: laid off; retired; on COBRA or any other form of continuation; or that *dependent* of such person will pay claims after the plan covering such persons as an active *employee* or the *dependent* of an active *employee*.

RMTS has also been told that it is believed that Mrs. Boykin had insurance with a different carrier prior to January 1, 2006. Had Mr. Boykin been offered COBRA timely, perhaps he would have elected coverage under his wife's plan earlier as a special enrollment under HIPAA. In any event, the stop loss contract specifically excludes Mr. Boykin's claims during this period.

6).    Estoppel

Finally, you argue that RMTS should have raised these eligibility issues prior to the expiration of Mr. Boykin's 12 weeks of FMLA. However, RMTS first received Mr. Boykin's eligibility information when RMTS received the claim on December 9, 2005, the day after the 12 weeks of FMLA expired. In any event, even if RMTS had received notice that Mr. Boykin's eligibility was being maintained by FMLA prior to December 8, 2005, RMTS would have had no reason to assume that Rosecrance would have continued his eligibility beyond the time permitted by FMLA.

As stated previously, if you have additional documentation that you would like Nationwide to consider that relates to this determination, please forward it to my attention.

Sincerely,

Christopher E. Wasson, Senior Counsel
Office of General Counsel

Enclosure

Cc:    Beth Uhlmann, Nationwide
       Ronald J. Geek, RMTS
       Anne Buckley, RMTS
       Marcia Horton, HCH Administration

5

### Ronald Geck

**From:**   Ronald Geck
**Sent:**   Friday, March 24, 2006 11:18 AM
**To:**     'Marcia Horton'
**Cc:**     Laurie Royer; Kristy O'Malley; Claims@rmts.net
**Subject:** RE: Rosecrance - Boykin

Marcia:

I have not yet received the letter you referenced. Our underwriting department has not reviewed the records because you did not include information we specifically requested, namely documentation supporting when Mr. Boykin was added to the transplant waiting list. I wrote to you on March 17, 2006 informing you that we needed the specific date he was added to the list in order to conduct our review. I have no record of a response.

I also show that information we requested in an e-mail to you dated March 16, 2006 remains outstanding. 1) How did Mr. Boykin become covered under his wife's Plan? (open enrollment, special enrollment, initial enrollment?) 2) Did he have coverage by his wife's employer prior to 1/1/06? While it appears the Blue Cross plan became effective 1/1/06, they may have been covered by another policy offered by Mrs. Boykin's employer prior to 1/1/06 and simply changed carriers effective 1/1/06.

Assuming under the facts you outlined that Mr. Boykin can elect COBRA while covered under his wife's Plan, such COBRA coverage appears to be secondary under the terms of the Rosecrance Plan which states in pertinent part in the Coordination of Benefits section.

> 5.    The plan covering an inactive person: laid off; retired; on COBRA or any other form of continuation; or that *dependant* of such person will pay claims after the plan covering such persons as an active *employee* or the *dependent* of an active *employee*.

That being said, please be advised that regardless of whether it is proper for the group to now backdate Mr. Boykin's COBRA effective December 9, 2005, the Stop Loss contract excludes coverage for charges incurred after Mr. Boykin's coverage expired on December 8, 2005. The Stop Loss Contract states in pertinent part:

> Notwithstanding the clerical error provision under Miscellaneous Provisions, this Contract shall exclude any amounts Paid for Covered Persons, whose coverage under the Consolidated Omnibus Budget Reconciliation Act (hereafter referred to as COBRA) is continued beyond the timeframes specified by federal law for any reason including clerical error of the Policyholder; **who do not receive a valid COBRA extension offer within the 30 days immediately following a COBRA qualifying event; who fail to make a valid, signed COBRA election within the 60 days immediately following the receipt of COBRA election rights from the Policyholder; or who fail to remit COBRA premium within the period specified by federal law.** The Company will require written documentation that these requirements have been satisfied. (emphasis added).

As discussed in previous correspondence, Mr. Boykin's coverage under the Plan ended at the expiration of his twelve weeks of Family Medical Leave on December 8, 2005. As you recognized in your February 10, 2006 e-mail and your March 16, 2006 fax, the group should have offered Mr. Boykin

6/22/2006

AUG 03 2006 14:58 FR NATIONWIDE          6146772285 TO #913128278176          P.08/08

Page 2 of 2

COBRA coverage effective December 9, 2005. This was the date of his COBRA qualifying event. Nevertheless, the group did not provide a COBRA extension offer until January 25, 2006 for COBRA coverage effective January 20, 2006. Since a valid COBRA extension offer was not made timely, the Stop Loss Contract excludes coverage for Mr. Boykin's claims at anytime his eligibility is purportedly maintained by COBRA.

Should you have any questions, concerns or additional information you would like us to consider, please contact me,

Sincerely,

Ronald J. Geck
V.P. Claims – Claims Examining

```
-----Original Message-----
From: Marcia Horton [mailto:MHorton@hcbadmin.com]
Sent: Thursday, March 23, 2006 2:48 PM
To: Ronald Geck
Cc: Laurie Royer
Subject: Rosecrance - Boykin

Ron,
We have spoken with the group today and they are going to revise Mr.
Boykin's COBRA effective date to 12/9/05.
Mr. Boykin does have BCBS effective 1/1/06, however, the COBRA rules state
that he can continue the COBRA coverage if he has the other coverage prior
to his election date. Mr. Boykin's election date is 2/1/06. Our
documentation on this is the Employee Benefits Institute of America (EBIA)
Fall 2004 page 292. They site a Supreme Court case Geissal v. Moore Medical
Corp, June 1998.

I'll send you the letter from the group regarding his COBRA effective date
and payment. I'm on vacation tomorrow and Monday, so Laurie will send it to
you if I don't get it today.

I'm thinking this is the last piece of info you need. Did underwriting have
a chance to review the medical info I last sent? If good to go, we want to
have this reimbursed as soon as possible since it has been delayed so long
already.

Thanks!
Marcia


DISCLAIMER:This e-mail, including attachments, may include confidential
and/or proprietary information, and may be used only by the person or
entity to which it is addressed. Any unauthorized review, use, disclosure or
dissemination is strictly prohibited. If you received this e-mail in error,
please notify the sender by reply e-mail with a carbon copy to
postmaster@hcbadmin.com and delete this e-mail immediately.
```

6/22/2006

** TOTAL PAGE.08 **