**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROSECRANCE HEALTH NETWORK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:07-CV-1140** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **NATIONWIDE LIFE INSURANCE** | : | **Magistrate Judge Abel** |
| **COMPANY d/b/a/ Nationwide Health Plans** | : | |
| | : | |
| **Defendant.** | : | |

## <u>OPINION AND ORDER</u>

## I.  INTRODUCTION

This matter comes before the Court on Plaintiff Rosecrance Health Network's

("Rosecrance") Motion for Judgment on the Pleadings as to Count I of the Complaint and Count

I of the Counterclaim, and Defendant Nationwide Life Insurance Company's d/b/a/ Nationwide

Health Plans ("Nationwide") Motion for Judgment on the Pleadings. For the reasons set forth

below, this Court **GRANTS** Plaintiff's Motion and **DENIES** Defendant's Motion.

## II.  BACKGROUND

## A. FACTUAL BACKGROUND

This action arises from a denial of coverage under an excess insurance policy purchased

by Rosecrance from Nationwide. Rosecrance is a charitable organization located in Rockford

Illinois. Nationwide is an Ohio corporation engaged in the business of providing health

insurance. Rosecrance provides health insurance coverage to its employees under a self-funded

insurance plan ("the Plan"). Rosereance's Plan defines the terms of its health insurance benefits

coverage for its employees.

On July 1, 2005, Rosecrance purchased an excess insurance policy (the "Stop Loss Policy") from Nationwide to cover losses incurred in connection with large, unmanageable, or catastrophic employee health care claims under its self-funded plan. The parties entered into a contract that defined the terms of the Stop Loss Policy (the "Contract" or "Stop Loss Contract"). The Contract covered the period of July 1, 2005 through August 31, 2006.

William Boykin ("Boykin") was an employee of Rosecrance from 1993 through January 19, 2006, and was a participant in the Plan. During Boykin's employment with Rosecrance, he developed a liver condition that would eventually require a liver transplant. Nationwide was aware of his liver condition prior to entering into the Contract because Rosecrance disclosed this on the Disclosure Statement to the Contract. As a result of Rosecrance's disclosure, Nationwide and Rosecrance negotiated a lifetime maximum benefit of $1,865,000, and nearly doubled Rosecrance's deductible amount to $135,000 as to claims pertaining to Boykin, in the event he received a liver transplant. (Contract at p. 4).

Boykin entered the hospital on September 16, 2005 for a liver transplant. He took a medical leave of absence from Rosecrance on that date, pursuant to the Family and Medical Leave Act ("FMLA"). Boykin remained hospitalized until his discharge on October 5, 2005. After being discharged, Boykin suffered a series of complications and was re-admitted to the hospital on November 23, 2005, where he remained until January 26, 2006.

During this second hospitalization, on December 8th, Boykin's twelve weeks of FMLA leave expired. Prior to the expiration of his FMLA leave, Boykin's treating physician had requested that Rosecrance extend Boykin's medical leave as a "reasonable accommodation" under the Americans with Disabilities Act. Therefore, on December 8th, Rosecrance granted the

requested accommodation and extended Boykin's leave for an additional six weeks. Rosecrance also extended Boykin's medical insurance coverage under its Plan for the duration of the leave of absence. On January 20, 2006, Rosecrance terminated Boykin. On January 25th, Rosecrance offered Boykin a COBRA extension of his health care benefits effective January 20th, which Boykin elected not to take. On January 26th, Boykin was discharged from the hospital.

After Boykin's discharge from the hospital, Rosecrance paid the charges for his hospitalization. Rosecrance timely submitted the necessary documentation concerning the hospitalization charges to Nationwide, seeking reimbursement under the Contract for its losses resulting from the claim, totaling $754,777.43. Of that amount, $135,000 was subtracted as the specific stop loss deductible for Boykin. Of the remaining $619,777.43, Nationwide paid $237,200.23 for reimbursement of what it deemed to be eligible benefits arising from the September 16, 2005 through October 5, 2005 hospitalization. Nationwide denied all coverage for Rosecrance's losses of $382,577.20 arising from Boykin's November 23, 2005 through January 26, 2006 hospitalization. Nationwide asserted those charges were "incurred" after December 8, 2005, and after that date, Boykin was ineligible for Plan benefits and was not a "Covered Person" under the Contract.

On August 3, 2006, Nationwide sent Rosecrance a letter articulating its justification for denying the claim for Boykin's hospitalization. Nationwide asserted that Rosecrance was prohibited from extending Boykin's health insurance coverage after expiration of the twelve week FMLA period, unless Rosecrance also issued him a COBRA extension within the 30 days immediately following a COBRA qualifying event. (Denial Letter at pp. 3-4).

## B. PROCEDURAL BACKGROUND

On November 5, 2007, Plaintiff filed suit against Defendant, alleging three counts arising from the partial denial of Plaintiff's claims for reimbursement:

1. Declaratory judgment that Defendant must fully reimburse Plaintiff for its claims relating to Boykin under the terms of the Contract;

2. Breach of Contract for Defendant's failure to fully reimburse Plaintiff; and

3. Violation of Illinois Insurance Code's prohibition against vexatious and unreasonable insurance claims settlement practices.

Defendant filed an Answer and Counterclaim, alleging two counts of relief against Plaintiff:

1. Declaratory judgment that Defendant fully complied with the terms of the Contract and properly denied Plaintiff's claims; and

2. Declaratory judgment that Defendant's conduct does not violate the Illinois Insurance Code.

Plaintiff filed a Motion for Judgment on the Pleadings as to Count I of the Complaint and Count I of the Counterclaim. Defendant subsequently filed a Motion for Judgment on the Pleadings.

## III. STANDARD OF REVIEW

A motion for judgment on the pleadings may be made "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings attacks the sufficiency of the pleadings and is evaluated under the same standard as a motion to dismiss. *Amersbach v. City of Cleveland*, 598 F.2d 1033, 1038 (6th Cir. 1979). In ruling upon such motion, the Court must accept as true all well-pleaded material allegations of the pleadings of the opposing party. *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith,*

*Inc.*, 479 F.2d 478, 480 (6th Cir. 1973). Such a motion may be granted only when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law. *Paskyan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

## IV. LAW & ANALYSIS

This case presents questions of interpretation of the terms of the Contract. The Contract specifies that Illinois law shall govern any dispute as to the Contract. (Contract at p. 2). Under Illinois law, the construction of an insurance policy is a question of law. *Outboard Marine Corp. v. Liberty Mutual Ins. Corp.*, 607 N.E.2d 1204, 1212 (Ill. 1992).

## A. CONTRACT COVERAGE CLAIM

Both parties agree that there are no issues of material fact presented by the pleadings in regards to Count I of Plaintiff's Complaint and Count I of Defendant's Counterclaim, both of which seek a declaratory judgment regarding Defendant's obligations in reimbursing Plaintiff under the Contract. Because the disposition of this issue turns on the construction of the terms of an insurance contract, and a determination of the rights and obligations thereunder, a judgment on the pleadings that declares the meaning and the extent of coverage under the Contract is appropriate.

Defendant's agreement to reimburse Plaintiff for eligible losses is defined by the terms of the Contract. The "Contract" constitutes the Stop Loss Contract. (Contract at p. 1). The "Entire Contract" constitutes "[the] Contract, the Application (including the Disclosure Statement), approved amendments and riders, and the Policyholder's Plan Document." (Contract at p. 9).

In construing insurance contracts, the court must ascertain the intent of the parties. *Outboard Marine*, 607 N.E.2d at 1212. "To ascertain the meaning of the policy's words and the

intent of the parties, the court must construe the policy as a whole . . . with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Id.* If the words are unambiguous, they must be afforded "their plain, ordinary, and popular meaning." *Id.* If the words are ambiguous because they are susceptible to more than one reasonable interpretation, however, they will be construed "in favor of the insured and against the insurer who drafted the policy." *Id.* Moreover, provisions that limit or exclude coverage are to be interpreted liberally construed in favor of the insured. *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997); *see Sigma Chi Corp. v. Westchester Fire Ins. Co.*, No. 08 C 767, 2008 WL 4722295, at *6 (N.D. Ill. Oct. 22, 2008) (the applicability of any exclusion of coverage must be "clear and free from doubt" and any doubts must be resolved in favor of the insured and "most strongly against the insurer").

### 1. *Actively At Work* Plan Provision

The Contract provides reimbursement for "Covered Persons Employee Benefit Plan Losses Incurred from July 1, 2005 through August 31, 2006, and Paid from July 1, 2005 through August 31, 2006." (Contract at p. 3). The Contract states that Defendant will not reimburse Plaintiff for "Amounts Paid for any Covered Persons who are not Actively At Work." (*Id.* at p. 13). A "Covered Person" is defined in the Contract as "any one individual entitled to benefits under the specific terms and provisions of the . . . Plan." (*Id.* at p. 5). "Actively At Work" is defined in the Contract as meaning, "on the Effective Date of this Contract a Covered Person who is an Employee . . . performing services for the [Plaintiff] . . . for 40 or more hours per week . . . " (*Id.* at p. 5).

The Contract also states, "[a]ny Covered Person who is on any leave of absence who is confined in a medical facility on the [Plaintiff's] Contract Effective Date shall not be considered Actively At Work." (*Id.* at p. 5). The Contract's "Effective Date" was July 1, 2005. (*Id.* at p. 1). Therefore, if any employee was entitled to benefits under the Plan, but was not performing services for the Plaintiff for 40 or more hours per week on July 1, 2005, then that person would fall outside the Contract and his or her medical expenses would not be reimbursed by Defendant.

The Contract also contained a Special Limitations Clause. Pursuant to this Clause, for Covered Persons listed on the Disclosure Statement, "the Actively at Work provision is waived." (*Id.* at p. 5). The Disclosure Statement listed Boykin. Hence, even if Boykin was not performing services for 40 or more hours per week for Plaintiff on the date of July 1, 2005, his medical expenses would still be subject to reimbursement.

The parties disagree about whether the "Actively At Work" provision was just waived in the Contract or whether the provision was waived in the Contract and in the Plan. The Plan's *Actively At Work* provision differs from the Contract's "Actively at Work" provision. In the Plan, *Actively At Work* is defined as, "[p]erforming on a regular, full-time basis all normal employment duties for at least 40 hours per week." (Plan at 2-1). Therefore, in the Plan, to be *Actively at Work*, an employee must be working ***at all points in time*** at least 40 hours per week to be covered, as opposed to just working at least 40 hours per week when the Contract went into effect (which is all the Contract requires).

The capitalized term "Actively at Work," as well as the other capitalized terms contained in the Special Limitations Clause, are defined terms in the Contract. All defined terms in the Contract are capitalized throughout the Contract. In contrast, the term *Actively At Work* as

defined in the Plan always appears in italics in the Plan, i.e., *Actively At Work*." (*See id.* at 2-1: "Defined words appear in *italic* throughout the *plan*"). Had the parties intended for the Contract's Special Limitations Clause to waive the *Actively At Work* provision of the Plan, they could have italicized that term in the Contract Clause. In fact, there are no italicized terms appearing anywhere in the Contract. This shows that the parties intended to use Contract defined terms only.

Construing the Contract's Special Limitations Clause as only waiving the "Actively At Work" provision in the Contract for Covered Persons who are disclosed also makes sense in the context of the Contract. The Special Limitations Clause waives the "Actively At Work" provision of the Contract for those persons, Boykin included, who were disclosed at the time of the Contract. Therefore, employees not meeting the Contract's definition of "Actively At Work" were not covered by the Contract unless they were disclosed to Defendant, and Defendant was given an opportunity to evaluate the risk and, if appropriate, set conditions or limitations on coverage. That is precisely what was done in Boykin's case; he was disclosed, the Contract's "Actively At Work" provision was waived for him, and a specific deductible of $135,000 was set.

It would not make sense to allow the Contract, a document that is not part of the Plan, to expand coverage under the Plan by waiving terms of the Plan. In fact, because Plaintiff's employees were not parties to the Contract, they would not be able to enforce this expansion. This means that if Plaintiff decided to not provide medical coverage for an employee who was not *Actively At Work*, the employee would have no recourse for breach of contract.

The Contract's Special Limitations Clause is clear and unambiguous. There is only one reasonable interpretation of the Clause that gives effect to the parties' intent and makes sense in the context of the Contract and the Plan. Thus, the Special Limitations Clause only waived the Contract's "Actively At Work" provision and did not waive the Plan's *Actively At Work* provision.

## 2. Special Provision For Not Being *Actively At Work*

Because the Contract did not waive the Plan's *Actively At Work* provision, Boykin still had to comply with the Plan's requirement of working at least 40 hours per week to be entitled to benefits. If Boykin was not in compliance with the Plan, then his medical expenses would not be reimbursable under the Contract. Boykin was hospitalized between November 23, 2005 and January 26, 2006; therefore, he was not *Actively At Work*. There is a section in the Plan, however, entitled "Special Provisions For Not Being Actively At Work" ("Special Provision"), which provides:

> If you continue to pay the required plan contributions, your coverage will remain in force for no longer than two months during an approved, non-military leave of absence, layoff, or period of total disability. Coverage that is required by the Family and Medical Leave Act will reduce any period shown above.

(Plan at 3-4). The FMLA grants up to twelve weeks a year of leave for, inter alia, an employee taking leave due to a serious medical condition. (*Id.* at 3-6). The FMLA "requires that coverage under [the Plan] be continued during a period of approved FMLA leave." (*Id.*). An employee could receive medical coverage for up to twelve weeks if on FMLA leave.

There are four ways to interpret the above Special Provision:

(1) An employee can only take up to two months of medically covered leave **in a year**. Any FMLA leave an employee takes reduces this period.

However, this interpretation is not consistent with the FMLA because an employee is entitled to three months (12 weeks) of medically covered leave a year under the FMLA.

(2) An employee can only take up to two months of medically covered leave **at a time**. Any FMLA leave an employee takes reduces this period.

This interpretation also is not consistent with the FMLA because an employee is entitled to three months (12 weeks) of medically covered leave at a time under the FMLA if the employee has not used any previous FMLA leave during that year.

(3) An employee can only take up to two months of medically covered non-FMLA leave **in a year**. However, if an employee takes any FMLA leave that year, that reduces the amount of medically covered non-FMLA leave an employee can take **that year**.

For instance, if an employee takes one month of FMLA leave, then the employee can only take one more month of medically covered non-FMLA leave that year. Or, if an employee takes two months of FMLA leave, then the employee cannot take any medically covered non-FMLA leave that year.

(4) An employee can only take up to two months of medically covered non-FMLA leave **at a time**. However, if an employee takes any FMLA leave during that two month period of time, that reduces the amount of medically covered non-FMLA leave the employee can take **at that time**.

For instance, if an employee takes one month of FMLA leave, then that employee can only take one more month of medically covered non-FMLA leave at that time; if instead, however, the employee took medically covered non-FMLA leave at a later point in time that year, the employee could take two months of such leave.

The only two interpretations of the Special Provision that are consistent with the FMLA are the interpretations which grant three months of FMLA leave in a year, **and** up to two months of medically covered approved non-FMLA leave either in a year or at a time, reduced by the amount of FMLA leave used either in a year or at that time. In other words:

(A) A person can only be approved by Plaintiff to take up to two months of medically covered non-FMLA leave **in a year**, and the option becomes non-

existent if the person has already used two months of FMLA leave **at any point that year**; or

(B) A person can only be approved by Plaintiff to take up to two months of medically covered non-FMLA leave **at a time**, and the option becomes non-existent if the person has already used two months of FMLA leave **at that time**.

It is indisputable under the Special Provision that FMLA leave is not the only leave that will allow an employee to retain medical coverage even though they are not *Actively At Work*. For example, if a person never took any FMLA leave, that person could be approved for a leave of absence of up to two months, and receive medical coverage for that time.

What is in dispute, however, is the impact of FMLA leave on non-FMLA leave. In Example (A) above, an employee who used two months of FMLA leave would not be eligible for coverage for any other leave of absence that year. If that employee wanted to take a leave of absence for a death in the family, or missed work for three days due to a minor surgery (which would not qualify for FMLA because it did not entail more than three days of incapacity), then that employee would lose coverage. In Example (B) above, an employee who used two months of FMLA leave could still be approved for a medically covered non-FMLA leave for up to two months at a later time that year, reduced by any FMLA leave taken during that two month period.

Ambiguous provisions of a contract are usually to be construed against the insurer, especially when the provisions operate to exclude coverage. The reason for generally construing ambiguous language against the insurer is because the insurer is "the party drafting the policy in the majority of cases." *See United Nat'l Ins. Co. v. Fasteel, Inc.*, 550 F.Supp.2d 814, 821 (N.D. Ill. 2008). The language at issue in this case is in the Plan, which was not drafted by the

Defendant insurer. The Contract, which was drafted by the Defendant insurer, incorporates the Plan.[1]

There is some Illinois appellate law indicating that the anti-drafter rule may be inappropriate when there are two equally sophisticated parties. *See Baxter Int'l, Inc. v. Am. Guarantee and Liab. Ins. Co.*, 861 N.E.2d 263, 269 (Ill. App. 2007) ("[t]he anti-drafter rule is intended to aid the party with less bargaining power during the drafting process and is not appropriate where the parties are equally sophisticated"); *Alberto-Culver Co. v. Aon Corp*., 812 N.E.2d 369, 378 (Ill. App. 2004) ("[t]he rule is intended to aid a party whose bargaining power was less than that of a draftsperson, and may be inappropriate if both parties are equally sophisticated in the use of the language"). Accordingly, because the parties in this case are both sophisticated entities with equal bargaining power, the Court finds the anti-drafter rule inappropriate. The Court will consider the type of insurance purchased, the overall purpose of the contract, the risks involved for each of the parties, and the contractual language to determine the intent of the Contract. *See Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007).

Plaintiff purchased a Stop Loss Policy that would only last for one year. The purpose of the Contract was to reimburse Plaintiff for employee health care claims paid in accordance with its Plan which exceeded the Contract deductible. In other words, the Contract would cover losses incurred in connection with large, unmanageable, or catastrophic employee health care claims, the risk of which Plaintiff could not afford to bear on its own.

---

[1] A document incorporated by reference into a contract is part of the contract itself. *Rosenblum v. Travelbyus.com Ltd.,* 299 F.3d 657, 664 (7th Cir. 2002).

To protect Defendant, after the one year policy period, if Defendant found that the risk it incurred was too great, coverage could terminate. In addition, there were dollar caps on the amount Defendant would reimburse Plaintiff for coverage for all employees, and dollar caps on the amount Defendant would reimburse Plaintiff for each individual employee.

For Boykin, his liver condition and potential transplant were disclosed to Defendant, so that, by Defendant's own admission, Defendant could have the "opportunity to evaluate the risk and, if appropriate, set conditions or limitations on coverage." (Def's Motion at p. 15). Due to Boykin's potential transplant, a higher deductible was set for him and a specific cap was set for him, but Defendant agreed to reimburse Plaintiff for medical coverage provided to him in accordance with the Plan. Therefore, Defendant had set up protections for itself to cap its liability in general and for Boykin in particular.

As the Defendant drafted the Contract, it could have included a clause stating that it would not reimburse Plaintiff for medical coverage provided for non-FMLA qualifying leave. Or, it could have put a clause into its Contract stating that a person could receive only two months of approved non-FMLA leave a year, but if any FMLA leave had been used that year, that would reduce the availability of non-FMLA leave for that year. Defendant could have provided any number of exclusions beyond the Plan, thereby limiting its liability even if Plaintiff was required to provide coverage under the Plan. Defendant chose not to include any such clause.

The Plan, incorporated into the Contract, had the purpose of setting out the terms and conditions of medical coverage for Plaintiff's employees. As such, any exclusions would have to be "clear and free from doubt." *Sigma Chi*, 2008 WL 4722295 at *4. Thus, if after using two

months of FMLA leave, an employee would lose medical coverage for any other non-FMLA absence that year, that would need to be clear in the Plan.

The Plan states that the Plaintiff "sets the benefits under the *plan*" and "sets the rights and privileges of *plan* participants to those benefits." (Plan at 4-1). And, the Plan states that "[t]he *plan* administrator will have full discretion to interpret *plan* terms; make decisions regarding eligibility; and resolve factual questions." (*Id.* at 4-11). The Contract states that Covered Persons, for whom losses are reimbursable, are those entitled to benefits under the Plan. (Contract at p. 5). The Contract does not alter the fact that the Plaintiff sets the benefits under the Plan and that the Plaintiff has full discretion to interpret Plan terms and make decisions regarding eligibility. The Contract specifically states that "the determination of benefits under the Plan is the sole responsibility of the [Plaintiff]." (*Id.* at p. 17). The Defendant only reserved the right "to interpret the terms and conditions of the Plan as they apply to the [Contract]." (*Id.* at p. 17). The Contract did not give Defendant the discretion to not reimburse Plaintiff for employee medical claims paid in accordance with the Plan. If this were allowed, then Defendant could choose to not pay any claims under the Contract.

Furthermore, when limiting Plan requirements or entitlements to a certain amount of time, the Plan states durational terms like "per week" or "per day" (i.e., Plan at 2-1 "40 hours per week;" *Id.* at 2-2 "15 consecutive hours per day"). Most notably, the FMLA leave provision specifically limits FMLA leave to 12 weeks "during any one 12 month period" (*Id.* at 3-6), and the COBRA provision limits when payments of COBRA may be increased "during any one 12 month period" (*Id.* at 3-13). The Plan has a defined term for "Calendar Year" which is "A 12-month period of time that starts on January 1 and ends on December 31." (*Id.* at 2-1). The

Special Provision does not state that an employee can receive up to two months of leave "per year," "during any one 12 month period," or "per Calendar Year."

It is not clear in the Plan that after using two months of FMLA leave, a person would be excluded from coverage for any other absence, with no opportunity to receive approval for an additional medically covered leave of absence. The Special Provision also does not provide that the two months of non-FMLA leave runs concurrently with FMLA leave or that if an employee uses two months of FMLA leave, that person cannot receive any other medically covered non-FMLA leave later that year. Such an exclusion would have been easy to include if that was the intent of the Plaintiff, and such an exclusion could have easily been included in the Defendant's Contract; however, no such exclusion exists.

Therefore, based on the contractual language and the manifested intent of the parties, this Court finds that the most reasonable interpretation of the Special Provision language in the Plan is that Plaintiff had discretion under the Plan to approve a medically covered leave of absence for up to a two month period, even if such leave was non-FMLA qualifying, and even if all FMLA leave had already been used.

### 3. COBRA Notice

Defendant also asserts that coverage for losses due to Boykin's hospitalization was forfeited because Plaintiff did not issue a timely COBRA notice. Defendant argues that pursuant to the Plan, once Boykin's FMLA leave expired, Plaintiff was required to offer him COBRA continuation, relying on a section in the Plan entitled "Termination Before the Maximum Leave Period." That section is ambiguous. First, it states that "[i]f the employee decides not to return to work, coverage under the plan *may* end at that time," but it also states that if "an employee does

not return to work at the end of FMLA leave, COBRA Continuation **will** be offered at that time."

(Plan at 3-7, emphasis added). Plaintiff asserts this provision granted Plaintiff discretion to

extend coverage because it stated coverage "may end."

Ironically, Defendant itself argues against using the "Termination Before the Maximum

Leave Period" section in this case:

> [T]he Plan provision quoted in [Plaintiff's] brief **only** applies to situations in
> which an employee both (a) takes less than the maximum twelve weeks of FMLA
> leave; and (b) decides not to return to work after his or her FMLA leave. . . .
> Here, however, it is undisputed that Mr. Boykin (a) took the maximum twelve
> weeks permitted under the Plan for FMLA leave; and (b) never "decided" not to
> return to work, because [Plaintiff] terminated him on January 20, 2006.

(Def's Reply Br. at p. 7). For the reasons urged by the Defendant, this Court finds this section

inapplicable to the issue in this case. This Court will not allow Defendant to prohibit Plaintiff's

reliance on this section, then attempt to apply this section for its own benefit.

Furthermore, COBRA notice is triggered only when there is a COBRA qualifying event.[2]

The Contract states:

> [T]his Contract shall exclude any amounts Paid for Covered Persons, . . . who do
> not receive a valid COBRA extension offer within the 30 days immediately
> following a COBRA qualifying event.

(Contract at p. 13). The parties dispute whether there was a COBRA qualifying event.

A COBRA qualifying event occurs when there is a reduction in the employee's hours

which would result in loss of coverage under the plan. *See* 29 U.S.C. § 1163(2). The Internal

---

[2]Pursuant to the Plan, if any part of the Plan conflicts with a law, such as COBRA, the
Plan is amended to comply with that law. (Plan at 4-11). Therefore, even if the "Termination
Before the Maximum Leave Period" section applied to this issue, which the Court has concluded
it does not, the language of the Plan was amended prior to the parties ever entering into the
Contract to require not just the expiration of FMLA leave, but also a COBRA qualifying event to
trigger COBRA.

Revenue Service regulations have also found that there is no COBRA qualifying event if the covered employee does not lose coverage. *See* 26 C.F.R. § 54.4980B-4. Therefore, a reduction in hours is **only** a qualifying event if it results in loss of coverage. *See, e.g., Jordan v. Tyson Foods, Inc.*, No. 3:05-0513, 2006 WL 3386890, at *7 (M.D. Tenn. Nov. 21, 2006) (the beginning of an authorized leave of absence did not trigger COBRA because the employee could continue his coverage for up to twelve months); *Ashcraft v. Shanango Furnace Co.*, 56 F.Supp.2d 895, 904 (N.D. Ohio 1999) (an employee retired, but he did not lose coverage, so COBRA was not triggered); *Rea v. Rail Am., Inc.*, No. 07-1024, 2008 WL 5157989, at *5 (C.D. Ill. Dec. 9, 2008) ("the reduction in hours becomes a qualifying event when the reduction reaches the point of losing coverage"); *Williams v. Teamsters Local Union No. 727*, No. 03 C 2122, 2003 WL 22424726, at *4 (N.D. Ill. Oct. 23, 2003) (an employee was terminated, but this did not result in a loss of coverage, so COBRA was not triggered); *Fenner v. Favorite Brands Intern., Inc.*, No. 97 C 5906, 1998 WL 249232, at *5 (N.D. Ill. May 12, 1998) ("termination that does not result in a loss of coverage does not constitute a qualifying event and does not trigger the [COBRA] notice requirements"); *Jachim v. KUTV Inc.*, 783 F. Supp. 1328, 1332 (D. Utah 1992) (an employee's hours were reduced from forty to zero hours per week, but because he did not lose coverage, COBRA was not triggered).

When Boykin took his medical leave beginning November 23, 2005, there was a reduction in hours. This reduction in hours did not result in loss of coverage under the Plan. For the first two weeks of leave, Boykin received continued health coverage, which was mandated by the FMLA. For the next six weeks, Boykin was granted a leave of absence in accordance with

the Special Provision of the Plan. Since he did not lose coverage on December 8, 2005, COBRA was not triggered.

COBRA was triggered on the date Boykin was discharged, January 20, 2006, because he lost coverage. Plaintiff sent Boykin a COBRA offer on January 25th, just six days after the qualifying event. Because Plaintiff timely offered COBRA, Boykin was not excluded under the Contract due to failure to receive a valid COBRA extension.

### 4. Date Costs Incurred

Defendant asserts that the costs for Boykin's second hospitalization were "incurred" after he ceased to be a "Covered Person" and were therefore not eligible for reimbursement. As already analyzed above, Boykin was entitled to coverage until his termination on January 20, 2006. Boykin was not discharged from the hospital until January 26th. The Contract has an Incurred Provision, which states:

> For inpatient hospital/facility charges and professional fees provided during an inpatient stay, a claim is considered incurred on the date the Covered Person is discharged from the hospital/facility.

(Contract at p. 6). Thus, "a claim" for Boykin's second hospital stay was "incurred" on January 26th, the date he was discharged.

Defendant urges that the Incurred Provision should be construed to mean that if at the time an employee was discharged from the hospital his insurance coverage had ended, then Defendant would not have to reimburse Plaintiff for any costs associated with that hospital stay. This Court, however, cannot entertain this interpretation for three reasons.

First, the Incurred Provision does not change the language of the Plan or the entitlement to benefits under the Plan. The Plan states that medical expenses are incurred on "[t]he date a

supply or service is provided." (Plan at 2-1). The Incurred Provision does not create an additional requirement that an employee must also be discharged from the hospital before they are entitled to benefits. Therefore, Boykin was entitled to benefits on each day that medical services were provided. The reference to "a claim" in the Incurred Provision is in the Contract, not the Plan. And, as Defendant has admitted, "[t]he parties did not intend for a provision of the Contract to operate to waive a provision of [Defendant's] own Plan, unless the language of the Contract expressed that intent." (Def's Motion at p. 16). Hence, "a claim" in the Incurred Provision refers to a claim **made by Plaintiff under the Contract for reimbursement by the Defendant**, not a claim **made by an employee under the Plan for benefits**. This, in turn, means that a claim was not incurred under the Contract until the date of discharge (i.e. Defendant was not responsible for reimbursing Plaintiff for costs paid on behalf of employees under the Plan until the date of discharge). The Incurred Provision is simply a timing provision, setting out when the Defendant must reimburse the Plaintiff; it has no bearing on whether an employee's medical expenses were eligible for reimbursement.

Second, pursuant to the Contract, Plaintiff is entitled to reimbursement for Covered Persons' medical claims. (Contract at p. 3). And Covered Persons are defined as individuals "entitled to benefits under the specific terms and provisions of the [Plan]." (*Id.* at p. 5). Since Boykin was entitled to benefits under the Plan, he was a Covered Person and his medical expenses are reimbursable under the Contract.

Third, Defendant's interpretation does not give effect to the intent of the parties. In construing an insurance policy, the court's main objective is to ascertain and give effect to the intent of the contracting parties. *Valley Forge Ins. Co. v. Swiderski Elec., Inc.*, 860 N.E.2d 307,

314 (Ill. 2006). To accept Defendant's interpretation would lead to absurd results. It would mean that even if an employee was a Covered Person under the Contract up until the day before discharge, if the employee ceased to be a Covered Person on the day before discharge, then none of the medical expenses would be reimbursed under the Contract. This would interfere with Plaintiff's ability to terminate its employees because it would not be able to terminate someone who was in the hospital because he/she would cease to be a Covered Person. This would also mean that if an employee died while in the hospital, and thus ceased to be a Covered Person, none of his/her medical expense would be reimbursed. And this would mean that whenever an employee had a serious condition that required such a prolonged hospital stay that coverage expired under the Plan, that employee's medical expenses would not be reimbursed under the Contract. The very purpose of purchasing the Stop Loss Policy was to protect Defendant against large, unmanageable, or catastrophic losses. It would not make sense to prohibit reimbursement for a medical condition that was so serious that it resulted in death or required a prolonged hospital stay.

Based on the rules of contractual interpretation and the parties' manifested intent, there is only one reasonable interpretation of the Incurred Provision that gives effect to the parties' intent in the context of the Contract and the Plan. The Incurred Provision means that pursuant to the Contract, a claim on the Stop Loss Policy is incurred on the date that the person entitled to benefits is discharged from the hospital. Defendant was not responsible for reimbursing Plaintiff until Boykin's discharge from the hospital. This is logical because Defendant would not want to deal with piecemeal claims for reimbursement from Plaintiff each day that an employee was in the hospital. Defendant is responsible for reimbursing Plaintiff for charges paid for employees

entitled to benefits under the Plan. Since Boykin was entitled to benefits through January 19, 2006, Defendant is responsible for reimbursing Plaintiff for Boykin's medical expenses through that date. Any charges paid for Boykin after January 19th were not losses incurred for a Covered Person because Boykin was not entitled to benefits after termination of his employment.[3] Therefore, Defendant is not responsible for reimbursing Plaintiff for Boykin's medical expenses after January 19th.

Consequently, Plaintiff's Motion for Judgment on the Pleadings for the Declaratory Judgment Contract Coverage Claim and Counterclaim is **GRANTED**, and Defendant's Motion for Judgment on the Pleadings for that same Claim and Counterclaim is **DENIED**.

## B. ILLINOIS INSURANCE CODE CLAIM

Plaintiff asserts that Defendant's conduct and delay in handling and rejecting its claims violates section 155 of the Illinois Insurance Code. The policy behind this section is to prevent harm to an insured who encounters an unreasonable and vexatious insurance company. *See Kinzer ex rel. City of Chicago v. Fid. & Deposit Co.*, 652 N.E.2d 20, 30 (Ill. App. 1995). Defendant alleges that it did not act in bad faith and that there was not an unreasonable and vexatious delay in settling or refusing to settle Plaintiff's claims. Both parties agree that there are material issues of fact that preclude judgment on the pleadings for this claim. (See Pl.'s Reply at p. 17; Def.'s Reply at p. 13). Therefore, Defendant's Motion for Judgment on the Pleadings for the Illinois Insurance Code Claim and Counterclaim is **DENIED**.

---

[3]Boykin elected to not extend his health care benefits through COBRA after termination of his employment.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS** Rosecrance's Motion for Judgment on the Pleadings for Count I of the Complaint and Count I of the Counterclaim and **DENIES** Nationwide's Motion for Judgment on the Pleadings. Nationwide must fully reimburse Rosecrance for Boykin's hospitalization charges through January 19, 2006 in excess of $135,000.00 as such charges are covered expenses under the Stop Loss Contract.

**IT IS SO ORDERED.**

       **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: March 23, 2009**